[PHILADELPHIA, JANUARY 26TH, 1839.]

## STEVENSON'S ESTATE.

APPEAL.

On the settlement of an estate, the Register allowed the executors *five* per cent. on the amount of the inventory, which exceeded $350,000, and auditors appointed by the Orphans' Court, allowed the same amount. The Orphans' Court reduced the commission to *three* per cent. on the amount which actually passed through the hands of the executors ; and the Supreme Court, on appeal, affirmed the decree.

THIS was an appeal from a decree of the Orphans' Court for the County of Philadelphia, in the matter of the settlement of the accounts of Samuel Grant and Henry Seaton, executors of the will of William Stevenson, late of the City of Philadelphia, deceased.

William Stevenson, the testator, died on the 14th day of December, 1832, having made a will, dated the 1st of December, 1829, and twelve codicils, the last of which was dated the 5th of December, 1832. The will and codicils contained altogether 102 items, relating to the disposition of his estate. He appointed his widow, Mrs. Rowland Stevenson, and Samuel Grant, James Perot and Henry Seaton, executors; of whom, only Mr. Grant and Mr. Seaton appear to have acted.

The accounts of the executors, which were settled on the 19th of May, 1834, were referred to auditors, who made a report; the material part of which is as follows :—

" The only matter in controversy between the parties, was the amount of commissions to which the executors were entitled.

The Register allowed commissions at five per cent. on the sum of three hundred and fifty-six thousand and seventy-five dollars and ninety-three cents, being the amount of the inventory filed by the executors, together with the increase of the estate up to the 19th of May, 1834, when the account was settled.

This commission was objected to by the legatees, for whom it was contended, that it should have been charged on the disbursements made by the executors, exclusive of the interest paid on the

(Stevenson's Estate.)

legacy to Mrs. Stevenson, the widow of the testator; that commissions were a compensation for services performed; and that, consequently, it was only on the completion of the business that they could be charged; that here was a large balance in the hands of the executors, the disposition of which was to be the subject of future operations; that, if from any cause, the executors should be prevented from conducting the business to a close, it could not be expected that others would perform the duties required by the will without compensation, and it would be unreasonable to burthen the estate with the payment of double commissions; and that the mode of charging now suggested, was in accordance with practice and with the decisions of the Supreme Court.

It was insisted also, that the rate of commissions was too high; that the executors had encountered little trouble; that the will clearly pointed out the course they were to pursue; that the administration of the estate consisted principally of the payment of legacies, one of which, that to the widow, was very large, and the services of the executors in reference to it, amounted to little more than the transfer of stocks and other securities.

The auditors are not aware of any decision of the Supreme Court which sustains the mode of charging commissions, proposed by the counsel of the legatees; nor does it appear to them, that it has been usually adopted in practice. On the contrary, they believe that the rule most frequently acted on is, to charge the commissions on the amount of the debit side of the account. The auditors are of opinion, however, that neither one rule nor the other can with propriety be invariably resorted to. Commissions being intended as a remuneration for time, trouble and responsibility, should be graduated by these objects, without a strict regard to the amount received or disbursed. This opinion is sanctioned by a late decision of the Supreme Court not yet reported. *Harland's Appeal.**

To determine the amount of compensation to which the present accountants are entitled, it became necessary to inquire into the nature of their duties and the extent of their services. To state them fully and particularly, would require much time, and be attended with considerable difficulty. A brief review of them will, perhaps, be sufficient for the present purpose.

The original will, which bears date the 1st day of September, 1829, and is very long, contains a great variety of testamentary dispositions; many of which are revoked or altered by the numerous codicils, which followed. These codicils, which are no less than twelve in number, and some of them very long, bear date respectively, on the 1st of December, 1829; the 26th of December, 1829; the 28th of August, 1830; the 11th of November, 1830; the 25th of January, 1832; the 24th of March, 1832; the 24th of August, 1832; the 22d of September, 1832; the 8th of October,

---

\* Since reported, 5 *Rawle*, 323.

1832; the 12th of October, 1832; the 3d of December, 1832, and the 5th of December, 1832. The whole presents a mass of testamentary arrangements in relation to a great number of devisees and legatees, extremely complicated in their character, and difficult to be carried into execution.

The special legacies are very numerous, and many of them small in amount. In many instances the legatees are not named, but a general description of them is given: for example, to the children of A. B. one hundred and fifty dollars each; thus imposing upon the executors the duty of hunting up the legatees, and ascertaining that they were the persons intended by the testator. A large majority of these legatees resided out of the state of Pennsylvania; some of them in England; some in Scotland; some in the W. Indies; some in Canada; some in Nova-Scotia; some in Georgia; some in Ohio; some in New-York; some in New-Jersey and elsewhere.

To ascertain who they were, and to obtain the necessary information in relation to them, the executors found it necessary to institute extensive and minute inquiries, and to carry on an extensive correspondence. Many of the legatees received their money under powers of attorney or drafts, which made the utmost care and caution necessary to guard against mistake and fraud. Some of these powers having been found imperfect, it became necessary to overcome their imperfections by special arrangements with the persons who held them, which sometimes led to difficulties of a very unpleasant nature. Among the legatees, some were found with similar names, which increased the difficulty of ascertaining who were meant by the testator, and, of course, the responsibilities of the executors.

The residuary legatees are fourteen in number; five of whom reside in the City of Philadelphia, and represent seven-ninths of the residuary estate; the other nine reside in New-Jersey, and represent the remaining two-ninths; and as might have been expected, conflicting opinions arose among them, which greatly increased the difficulties which the executors had to contend with. In the spirit of accommodation, advances were made to the residuary legatees; in one instance to such an extent as to cause complaints by the others, and pressing applications to be put upon the same footing. This state of things necessarily occasioned frequent and unpleasant drafts upon the time and attention of the executors in frequent interviews and explanations with the legatees. The residuary estate consisting principally of bonds, mortgages, and other debts, could not be promptly realised, nor could the collection of the money be pressed without great risk. The legatees having declined to take these securities, various projects were suggested for the disposition of them; none of which could be carried into operation, as the legatees could not agree upon any plan. With some of the debtors the executors had painful duties to perform, arising from the character and situation of the debtors, and the relation in which they stood to

the testator. There are too, it appears, claims in the West Indies, which have been a source of great trouble to the testator as well as to the executors; from some of which there is little probability of receiving any thing, while from others something may be obtained by diligence and perseverance.

A great number of instances might be adduced, in which the executors have had duties imposed upon them of a most distressing and onerous character, and such as rarely fall to the lot of those who exercise that office. To enter minutely into these matters in this report would be unnecessary, and in some respects improper: but upon a full view of the whole case, the auditors are of opinion, that the commissions allowed by the register, although at the first view they appear large, do not exceed a reasonable remuneration to the executors for their time, trouble and responsibility, and they allow it accordingly."

Exceptions were filed to this report; and the following testimony was taken in support of the claims of the executors.

Dexter Stone deposed :—

" I am in partnership with Samuel Grant, and have been so for many years. The services and attentions of Mr. Grant are, and have been of great importance to the concern. He is the senior partner. In consequence of his devotion to the business of Mr. Stevenson's estate, his time, talents and services were withdrawn in a degree which was very material, from the business of the commercial house. I suggested my wish for an alteration in our shares of profits, and urged it on several accounts, and among others, in consequence of the duties thus fulfilled by Mr. Grant towards the estate of Mr. Stevenson, and a new arrangement was made accordingly between us. The effect has been important upon Mr. Grant's pecuniary receipts as a partner of the house. I firmly believe it will amount to a sum not less than five thousand dollars in his settlement with the firm. In the general effect upon the interests of the concern, and especially upon Mr. Grant personally, it is my belief that injury of a pecuniary character has been suffered; and that it would have been more profitable in that light to Mr. Grant, if he had not assumed the said executorship, and attended to its duties as he has done."

On his cross-examination he said :—

" Mr. Grant has been executor to other estates during the period to which I refer. Mr. Stevenson's estate, Mr. Ellmaker's estate, he is an executor of. Mr. E. died in February, 1835."

William Harrison deposed :—

" That he has been employed as book-keeper by the firm of Grant and Stone, (and the former firm of Grants and Stone,) about eight

or nine years. He is occupied almost constantly in the counting-house. The senior partner of the house is Mr. Grant; and his talents and time are of peculiar importance to the concern. During the years 1833 and 1834, the time and attention of Mr. Grant were very much occupied in the business of the estate of Wm. Stevenson. The deponent would think, that one-third of his business time was occupied with that estate. Messrs. Grant and Stone do a very large business; and great reliance is placed upon Mr. Grant's personal services. The devotion of these services to Mr. Stevenson's estate was injurious to the interests of the mercantile house. The deponent had no personal knowledge of the arrangements made between the partners as to their respective shares of profits. He knows that the profits of the concern were considerable; and he firmly believes, that the firm was a loser by reason of Mr. Grant's devotion to the concerns of Mr. Stevenson's estate; and that he would make a moderate allowance to the concern in yielding five thousand dollars as an equivalent for the loss of his attention to the partnership business, by reason of his care and time which were given to Mr. Stevenson's estate."

After argument, the Orphans' Court made a decree, by which they reduced the commissions of the executors to three per cent. on the amount actually received and disbursed by them.

From this decree both the executors and the legatees contesting their claims, appealed to this Court.

Mr. *J. R. Ingersoll*, for the executors.

Commissions, as a compensation to executors, are universal in Pennsylvania. The rule is well settled. A testator must be supposed to make his will in reference to the well known custom. The trust must be perfectly secure. In order to render it so, the ingredients of confidence and fidelity must exist beyond the possibility of doubt. In the various orders of individual character, these motives govern the testator in the selection of his representatives. In the case of a large capitalist like Mr. Stevenson, compensation is not the object looked at by the testator, but integrity and wealth in his executors. Within the last ten years several accounts have been settled in the Register's Office here of large estates, between 300,000 and 500,000 dollars; in which five and six per cent. have been allowed to executors, without opposition. The late venerable Chief Justice of this Court directed by his will that his executors should receive six per cent. commission. In this case there were peculiar difficulties, embarrassments, labour and responsibilities thrown upon the executors from the very beginning of the trust.

[Mr. *Ingersoll* then went into a particular examination of the will of the testator, the accounts of the executors and the documentary and other evidence produced, to show the extent and amount of the

duties and trouble of the executors. He also contended, that the estate had been considerably augmented by means of their judicious management.]

In England it is by no means the case, that commissions are not allowed. Sometimes the will directs it, as in *Webb* v. *Earl of Shaftesbury*, (7 *Ves.* 480.) Sometimes it is applied for and allowed; but it must be beforehand. *Brocksoff* v. *Baines*, (5 *Madd.* 61.) In India the rate is the same as with us. *Chetham* v. *Lord Audley*, (4 *Ves.* 75.) *Cockerell* v. *Barton*, (1 *Sim.* 23; S. C. 2 *Eng. Ch. Rep.* 407. 492.) In *Gibson's Case*, (1 *Bland. Rep.* 147,) it was said that labour and risk ought to increase the compensation. The average rate of commissions in Pennsylvania is five per cent. *Ashmead's Rep.* 318, *note.* This is varied sometimes in reference to the amount of the estate and the greater or less trouble of the executor. The responsibility, which is another element, has been enormous in this case. Upwards of $300,000 were thrown into the hands of the executors at a period of uncommon difficulty and embarrassment in the money market. Money was collected with difficulty from the debtors to the estate; and many of the legatees were importunate. In the analogous case of factors, the usual charge is five per cent. on sales, and two and a half on remittances. As to the amount on which the commissions are charged, the difference between stocks or bonds and money, in respect to the trouble of management, is often merely imaginary. The collection of bonds and notes is often attended with great trouble and risk. The character and respectability of the persons, who are called upon to act as trustees, is of the greatest importance in weighing the amount of commissions. If they are to be reduced to the amount proposed in this case, few persons of character and property will consent to undertake the office.

Mr. *Meredith*, *contra*.

This estate was composed principally of stocks, bonds, and mortgages. There were very few simple contract debts. The books left by the testator contained full and particular statements of all his funds. The duties of the executors were neither laborious nor complicated. A large proportion of the items in their accounts consists of large payments to Mrs. Stevenson and other legatees. The auditors allowed a sum equal to nearly ten per cent. on the amount which actually passed through the hands of the executors. The Orphans' Court held that the commission should be upon that part of the assets only which had been actually administered. According to the report of the auditors, if the present executors should die or resign, a new commission must be paid to their successors. There has been nothing extraordinary in the labours of these gentlemen. [Mr. *Meredith* here discussed the several instances adduced by Mr. *Ingersoll* from the accounts and other matters in evidence in reference to

(Stevenson's Estate.)

the degree of their trouble, and argued that their exertions and responsibilities were not greater than usual in large estates.] The cases of accounts settled in the Register Office, and which have passed *sub silentio*, are not of authority here. No instance can be produced in which the Court, after a discussion of the subject, has allowed five per cent. upon the principal fund, in an estate exceeding $300,000. The leading cases are *Pusey* v. *Clemson*, (9 *Serg. & Rawle*, 204,) and *Walker's Estate*, (9 *Serg. & Rawle*, 223.) In *Pusey* v. *Clemson*, the estate was about one hundred thousand dollars, and this Court reduced the commission to three per cent. It is a settled rule, not to allow commissions by way of anticipation. Here the expenses of the executors have been allowed, and they have always had the advice and responsibility of eminent counsel, whose services have been paid by the estate.

PER CURIAM.—The responsibility which is incurred by the receipt and disbursement of money, is a legitimate subject of compensation; and an unvarying rate per cent., without regard to the magnitude of the sum, will always be a just measure of it, because the responsibility increases in proportion to the amount. It is consequently susceptible of a uniform measure, which we think may be reasonably put at two and a half per cent. Not so the compensation of trouble. The settlement of a very large estate may be the business of a few days, while that of a very small one may occupy as many years; and the compensation for all beyond the responsibility ought to be graduated to the circumstances. What beyond it was there here? The bulk of the property was readily convertible into cash, and but little of it was outstanding. The thirty or forty items of special service on which stress has been laid, are such as occur in almost every case, and they are beside, emphatically small. We think them amply remunerated by the additional half per cent. allowed by the Orphans' Court; in whose decree we find nothing to correct.

Decree affirmed.