EHRMAN and others *v.* STEAM-SHIP SWIFTSURE.

*(District Court, D. Maryland.* November 8, 1880.)

1. SALVAGE — TOWAGE.—Service rendered by a steamer, in the course of its regular pursuit, in towing and relieving a vessel, under circumstances of no unusual danger to life or property, and without the exercise of unusual activity, enterprise, or heroism, should not be regarded as meriting a reward out of all relation and proportion to what would have been accepted upon a contract contingent upon success.

   *The Birdie,* 7 Blatchf. 243.

   *The H. B. Foster,* 1 Abb. Adm. 235.

2. SAME—SAME.—In such case the allowance should be sufficiently liberal to make every one concerned eager to perform the service with promptness and energy, and also to encourage the maintenance of steamvessels sufficiently powerful to make the assistance effective; but it should not be so large and so out of proportion to the services actually rendered as to cause vessels, in situations in which it was expedient that they should quickly accept such assistance, to hesitate or decline to receive it because of its ruinous cost.

In Admiralty.   Libel for salvage.

*Sebastian Brown* and *I. Nevett Steele,* for libellants, cited: *The Ship Ewbank,* 1 Sumn. 400; *The Independence,* 2 Curtis, 357; *The Brig Dodge Healy,* 4 Washington, 651; *Tyson* v. *Prior,* 1 Gallison, 135; *The Emulous,* 1 Sumn. 207; *The Clyde,* 5 Ben. 98; *Sonderberg* v. *Tow-boat Co.* 3 Woods, 146; *The Ship Charles,* 1 Newb. 340; *The Chalmette,* 1 Woods, 399; *The City of Valparaiso,* 2 Lowell, 501; *The Amerique,* 6 L. R. Privy Council Appeals, 475.

*John H. Thomas,* for respondents, cited: *The M. B. Stetson,* 1 Lowell, 119; *The Jas. T. Abbott,* 2 Sprague, 101; *The I. F. Farlan,* 8 Blatchf. 207; *The Stratton Audley,* Id. 264; *The Underwriter,* 4 Blatchf. 94; *The Birdie,* 7 Blatchf. 239; *The*

*Colon,* Dt. Ct. S. D. of N. Y., opinion by Judge Choate, Aug. 14, 1878; same case in Ct. Ct., opinion by Judge Blatchford, July 9, 1880, *supra,* 469; *The Plainmiller,* 2 FED. REP. 872.

MORRIS, D. J. The British steamer Swiftsure, 1,920 tons, laden with a cargo of iron ore, on a voyage from the coast of Africa to Baltimore, went aground about 9 o'clock on the morning of May 9, 1880, in the waters of the Atlantic ocean, about three miles from the light-house on Smith's island, and about 10 miles from the entrance into the Chesapeake bay. The morning was pleasant, with a somewhat hazy. atmosphere, and the sea was smooth, but the master of the steamer mistook the light-house on Smith's island for that on Cape Henry, and when his vessel touched the bottom supposed that he was on a bar, and kept her at full speed until he had forced her over a mile towards the shore, and until she rested firmly bedded in the sand. During the forenoon the sea was very smooth and the wind south-west, and the steamer lay solidly in the sand, and those in charge of her appear not to have been specially alarmed at her situation, and to have confidently hoped that she would float off without injury at high tide, which would be between 7 and 8 o'clock in the evening.

The steam-tug R. T. Banks, learning from the pilot-boat that the Swiftsure was aground, went to her about 11 o'clock, but finding the captain of the Swiftsure intoxicated, and the first officer not willing to employ him, the master of the tug concluded not to remain by her. The keeper of the life-saving station at Cape Charles, learning the steamer's situation, went out to her about 11 o'clock and boarded her. He found the captain intoxicated, and had an understanding with the mate that he should keep a lookout for them during the night, if they should have to remain, and that he should show a light on a favorable landing place on the shore should the steamer burn signals of distress. About midday the two steam-tugs America and Rattler, while cruising just outside of the capes of the Chesapeake bay looking for vessels coming from the sea to be towed in were informed by the pilot-boat

that the Swiftsure was aground on Smith's island. They at once proceeded to where she was lying, a distance of eight or ten miles, and they arrived along-side of her about 2 o'clock in the afternoon. These two tugs are among the most powerful on the Atlantic coast, and are well equipped for relieving stranded vessels. They offered assistance, and were invited on board of the steamer.

The wind, which had been south-west in the morning, was now south-east—that is to say, directly from the ocean—and the water, which in the morning had been very smooth, was now much rougher, so that the steamer, as the tide rose, was thumping more and more upon the bottom. Her officers were in consequence fearful that she might receive serious injury if the thumping continued, and when the tugs arrived were making some preparations looking to throwing overboard a portion of her cargo if the thumping should increase and the ship not get off as the tide rose. The officers of the steamer asked the captains of the tugs if they thought they could get the steamer off. They replied that they could, and were willing to try. They were then told that the sooner they got to work the better. The tugs made fast first one and then two hawsers to the stern of the steamer, and by using one tug to keep the other in position, as well as to assist in pulling, and with the aid of the powerful propeller of the steamer herself, they presently got the steamer so that she would move when lifted by the roll of the sea, and little by little they pulled her a mile or more, until she was in water where she would float. They were occupied in this service until about half-past 5 o'clock. When the steamer was fairly afloat, and in deep water, her captain declined further assistance from the tugs, and, obtaining a pilot, came in through the capes and up the bay to Baltimore. She was there examined by marine surveyors, and found not to be in any respect injured in hull or machinery, nor was her cargo damaged.

The value of the steamer was about $110,000, and her cargo about $15,000. She was 275 feet long, and had engines of

180-horse power. She was a well-built iron steamer, launched in August, 1878. The value of the two tugs was between $30,000 and $40,000.

I think it clearly appears that the steamer, at the time the assistance was offered, was in peril, and that her officers so considered her. The wind and sea were increasing. That part of the coast is considered very dangerous, and liable to sudden storms. The tide there has a rise of four feet, and it would have been high tide between 7 and 8 o'clock; but it appears to me that it was almost a mere chance that the steamer would have been able to get off at high tide by her own power alone. She was not on a bar, but fully a mile in shore, and with shoal water all around her. The wind had a tendency to carry her further in, and the thumping was very likely to cause her to bilge and to put her machinery out of working order. I think there can be no doubt that it would have been culpable hardihood in her master to have refused the assistance offered by the tugs, and to have relied upon the chance of getting off at high water without their aid. The service of the tugs was, therefore, a salvage service, as distinguished from mere towage. It led to the rescue of the ship from danger, and should be remunerated as salvage.

It is to be considered, however, that the tugs, in rendering this service, were not going outside their usual occupation and use. They were both, when they started for the Swiftsure, outside of the capes, looking for employment. One of them had been so far out as to meet the Swiftsure as she was coming in from the sea early in the morning. They encountered no unusual risk either to life or property, and the officers and crew endured no unusual fatigue or labor, and neither men nor vessel met with any injury. There was ample depth of water all around the Swiftsure for the tugs to navigate, and the weather was not stormy nor threatening. So that, although the assistance was most timely and in the highest degree beneficial to the steamer, it was, so far as the tugs were concerned, hardly different from any other three hours of their daily employment. It is scarcely to be doubted

that if they had been solicited in the morning to undertake the service for a fixed price they would have agreed to remain, so long as the weather was such as in fact it continued to be, along-side the steamer, and work at her for their usual compensation per hour.

Norfolk was only 35 miles off, and in that port there were two wrecking companies, owning powerful steam-vessels, kept for the purpose of rendering assistance to disabled and wrecked vessels. Two of these, the Resolute and the Rescue, started to go to the Swiftsure, one of them at 4 o'clock in the afternoon and the other at 11 o'clock at night. So it appears that the Swiftsure was not lying where she would be likely to remain long without assistance if she had signalled for it, or had taken means to communicate with the shore. Although, therefore, this is a case of salvage, it is one of a low order of merit, and wanting in those features which chiefly have prompted generous allowance proportioned to the value of the property saved.

It has been held, and I think rightly, with regard to steamers whose regular pursuit is to tow and relieve vessels, and where connected with the service rendered there are no circumstances of unusual danger to life or property, and no unusual activity, enterprise, or heroism displayed in going out to render it, that such service should not be regarded as meriting a reward out of all relation and proportion to what would have been accepted upon a contract contingent upon success. *The Birdie,* 7 Blatchf. 243; *The H. B. Foster,* 1 Abb. Adm. 235.

The allowance in such cases is intended to be sufficiently liberal to make every one concerned eager to perform the service with promptness and energy, and also to encourage the maintenance of steam-vessels sufficiently powerful to make the assistance effective. It would be contrary to the spirit of the maritime law to reduce the salvage compensation below this standard of liberal inducement, and it would equally frustrate its purpose if the allowance should be so large and so out of proportion to the services actually ren-

dered as to cause vessels, in situations in which it was expedient that they should quickly accept assistance of the character rendered in this case, to hesitate or decline to receive it because of its ruinous cost. Endeavoring to keep clear of both the difficulties above indicated, and intending to practically apply the rules of the maritime law and the spirit of the precedents in our own courts of admiralty to which my attention has been called, I have concluded in this case to award to the salvors the sum of $2,500.

With regard to the costs, although the claim of $40,000 made by the libellants was extravagant, and may have operated oppressively upon the respondents, yet, under all the circumstances of this case, and as it is not shown that any tender or offer of any definite sum was ever made to the libellants, I am not inclined to vary the usual rule.

NOTE. See *P. P. M. & W. Co.* v. *The Steam-boat H. C. Yeager,* 1 FED. REP. 285; *Mayo* v. *Clark,* Id. 735; *Corwin* v. *The Barge Jonathan Chase,* 2 FED. REP. 268.