WILDER'S STEAMSHIP COMPANY, Limited, *v.* THE
BRIGANTINE "LURLINE."

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED MARCH 15, 1897.     DECIDED JUNE 17, 1897.

FREAR AND WHITING, JJ., AND C. BROWN, ESQ., OF THE BAR,
IN PLACE OF JUDD, C.J., DISQUALIFIED.

Salvage.

The Court will not reverse the decision of the trial judge in admiralty
in salvage cases unless it manifestly appears that some important
error has been committed.

There is no fixed rule by which a percentage of the value salved should
be awarded, but such awards are largely within the discretion of
the trial judge.

This Court declines to disturb an award of one-fourth by the trial
judge, the claim being for a third.

OPINION OF THE COURT BY WHITING, J.

Circuit Judge Perry heard this case below and decreed that
the libellant is entitled to salvage in a certain amount, and the
libellant appeals to this Court.

The decision appealed from is as follows:

This is a libel for salvage brought by the Wilder Steamship
Company, Limited, a Hawaiian corporation, for itself and others
interested as salvors, against the brigantine "Lurline," her
tackle, apparel, furniture and ballast.

From the evidence adduced at the trial, I find the facts to
be as follows:

About 1.30 o'clock on the morning of December 5th last, the Lurline, being then at anchor in the harbor of Kahului, Maui, parted her chains during a storm, and was driven towards the shore by the wind and waves, and at about 2 o'clock of the same morning went on the reef. At the time, the wind was from the north, *i. e.*, towards the shore, the sea rough and breaking, and rain falling. The swell, after landing the vessel in shallow water, continued moving her inwards over the reef until at about 6 o'clock of the same morning, when Robert English, pilot of that harbor, went aboard, she was about forty or fifty feet beyond the line of deep water. From that time until the arrival of the Likelike, the Lurline was carried six or seven feet still further in. Shortly after the vessel struck, Captain Brown of the Lurline sent a boat ashore to notify the pilot that he was wanted on board, but, owing to the darkness and to the state of the sea, the pilot delayed going out until daylight, when, with a crew of six men from shore, he rowed to the Lurline. She then had two stern lines out, fastened to what is known in that harbor as stern mooring number two. Efforts had already been made by the captain, and were thereafter continued, to pull the ship off with the aid of the donkey-engine aboard by hauling on the stern lines first, and later on the bow lines which the pilot had, before coming aboard, made fast from the Lurline's bow to what are known as the bow moorings; but without success, for it was found by those on board that there was danger, if too much strain was put on the lines, either of the donkey-engine breaking away from its fastenings, or of the hawsers parting. Moreover, after heaving for some time on the stern lines, the stern mooring to which said lines were fast, yielded to the strain and dragged for some distance towards the Lurline, rendering further heaving on these lines of little avail. This attempt was, therefore, given up, and the bow lines merely kept as nearly taut as possible to prevent the ship from going further on the reef.

At about 9 o'clock that morning, D. Center, who represents to some extent the owner of the Lurline, went on board. While

there, and before the arrival of the Likelike, he suggested to
Captain Brown that the steam-plows of the Hawaiian Commer-
cial and Sugar Company might be used on shore .as a means
with which to pull the Lurline from her position on the reef
into deep water; but Captain Brown apparently did not think
the plan a good one and dismissed it from his mind without
much consideration.

In his efforts, Captain Brown made use of all the tackle
belonging to the ship and also of such as was sent to him from
the shore. He continued doing all that could be done to prevent
the vessel's going further towards the beach until shortly after
Center's arrival on board, when libellant's steamship Likelike
came into harbor on her way to Honolulu on one of her regular
trips. By this time the storm had abated and the swell had
gone down; a little wind came occasionally in puffs; the sea
was smooth; but the weather was still threatening.

Captain Andrews of the Likelike at once went aboard the Lur-
line and offered assistance, which Captain Brown accepted. After
inquiring what hawsers the Lurline had on board, Andrews re-
turned to the Likelike, coming again shortly thereafter to the
Lurline. He then mentioned to Brown the subject of compensa-
tion, said that his price was $5000, and handed to Brown a bill
for that sum for signature and approval. Brown protested, urg-
ing that the value of the vessel before going ashore was not more
than $4000, and that the compensation demanded was "outra-
geous and piratical." Center who was also present, inquired
of Andrews whether a reduction could not be had at the Hono-
lulu office to $2000 or $2500. Andrews replied that he could
not say as to that, that the officers of the company in Honolulu
might make the reduction if they saw fit, and concluded by
saying "$5000 or no hawser." Brown, believing that his ship
was, to use his own language, "in extremis," "in imminent dan-
ger of loss," and that no other assistance was available, yielded
and signed the paper. The agreement between the two captains
was however, that that sum was to be paid only if the Lurline
was taken from her position on the reef and safely towed to

Honolulu harbor, and that unless all of this was done, nothing was to be paid to the Likelike for her services.

The Lurline's seven-inch hawser was then made fast to her stern and to the Likelike. After the latter had pulled for a few minutes and moved the Lurline three or four feet, the hawser parted. A second attempt was then made, the hawser being on this occasion made fast to the bow of the Lurline; but after one-quarter of an hour's strain, it again parted. The Likelike took in her six-inch line which she had had out to the bow moorings, and both that, and the seven-inch hawser of the Lurline were made fast to the latter's stern. After another brief attempt, it was found impossible to move the Lurline, the water being low. The lines were made taut by the Likelike and held thus until the next high tide which came at 11 or twelve o'clock the following night.

At 9 or 10 o'clock in the morning, the Lurline, as she lay on the coral bank, was drawing seven feet of water forward, five feet in the middle, and eight feet aft.

From the time the Lurline struck the reef until the lines from her were made fast to the Likelike and held taut, the former vessel thumped on the rocky bottom, more heavily while the storm lasted, even to the extent of shaking the masts and rigging considerably, and less so after the weather moderated. The strain on the lines from the Likelike practically put an end to the severe thumping, so that the injury to the Lurline's hull may be said to have been received between the hours of two and nine that morning. The injury, as found upon an examination of the vessel while on the marine railway in Honolulu, was as follows:

The keel, which was a solid piece of wood two feet deep and fourteen inches thick, was split and chafed for a distance of sixty-four feet, and in some places worn away right up to the garboard plank, so that an entire new keel was necessary. The old keel had been fastened with one and one-quarter-inch bolts, more plentiful than in the ordinary vessel. Where the keel

was worn away, all of the bolts were completely bent. The four-inch garboard plank was very badly chafed and in two places broken. On the starboard side, five planks on the bottom, were bruised and chafed for a distance of forty feet commencing at the keel and counting towards the bilge. In places, the oakum had started. The shoe was gone the entire length of the vessel. The stern post was started, the upper rudder brace broken, both pintles bent, and the wood lock gone.

At about 1:30 or 2 p. m. of that Saturday the crew of the Lurline, being six men, together with the pilot's crew of six men, and fifteen men from the Likelike, began to take out the ballast (two hundred tons of sand) of the Lurline, in order to lighten her and facilitate the saving of the ship, the work being finished at about 8 o'clock the same evening.

When the Likelike arrived in the morning the wind had changed to nearly northeast, and from that direction it continued to come for the remainder of the day. The following night was dark and rainy; at about 11 o'clock, the tide being then high and the swell, which was again coming in, occasionally lifting the Lurline from the bottom for a moment, the Likelike commenced a third attempt to pull the Lurline off. This attempt was successful; at about midnight the Lurline reached deep water. At daylight, forty or fifty tons of ballast were put back aboard the Lurline, and some time before noon of Sunday the Likelike began to tow her to Honolulu, via Lahaina, the former port being reached in safety at daylight on Monday morning, twenty-four hours later than the Likelike's schedule time.

Pilot English and his crew remained on board the Lurline, rendering all the assistance possible, from daylight Saturday morning until the Likelike left with her in tow on Sunday, with the exception of two or three hours just before daylight on Sunday during which they went ashore for a change of clothes rendered necessary by their work in the rain.

The Likelike's routine of taking on freight and passengers

went on as usual during this voyage, and without interruption. She left Honolulu on her next regular trip on schedule time. No loss is shown to have occurred to her business by reason of the delay caused by the salvage service, and it is therefore to be presumed that there was none. Her crew has been paid by the libellant eighty-six and 50-100 dollars for the extra services rendered, and the extra coal used cost about twenty-two dollars.

In making the attempts above mentioned to pull off the Lurline, the Likelike, whose engines are of about five hundred and ninety horse power, went ahead at full speed, at the same time heaving on her anchors in order to get as much strain as possible on the hawsers. In taking hold at each attempt, she lay in about fifteen feet of water, drawing at the time eleven and one-half feet; the distance from her to the Lurline was about three hundred or four hundred feet, and to the reef across the harbor to which she (the Likelike) was obliged to head in pulling, about six hundred feet. The precautions taken by Captain Andrews to prevent accident were, to station the mate at the bow to see whither the steamer was going, the chief engineer at the skylight to repeat to those on duty below the orders to stop and reverse, and himself aft to watch for any parting of the lines. The usual number of the crew, to wit, fifteen men, were on duty on deck, while the remaining ten were asleep below. No lights were placed on the bow moorings nor at any other point in the harbor, the presumption being that it was deemed by Captain Andrews unnecessary to do so.

In performing her work of salvage, the Likelike was in some danger, but the degree of that danger it is difficult to describe by the use of adjectives. To be exact, the danger was this, that if, upon the parting of the hawsers while pulling at full speed, the engines for any reason had not been stopped and reversed in time, and if the anchors had failed to hold, and if the steamer had not been steered out into the channel in time, she would have struck the high reef opposite and would undoubtedly have

suffered severe injuries; she could have pulled in no other direction, the nature of the harbor being such as to render it absolutely unsafe to do so. As a matter of fact, on each of the three occasions, the steamer was stopped, whether by her anchors or by her engines, before reaching the reef and without injury. That Captain Andrews relying upon his experience in and knowledge of the harbor, did not consider the danger a grave one, is shown, I think, by his failure to place lights in the harbor and by his permitting the passengers to remain on board. It should be borne in mind, however, that that same experience and knowledge of the captain which lessened the danger to the Likelike materially added to the value of her services.

It is also in evidence that the libellant has had, for some time past, standing orders to the masters of its vessels not to enter or sail out of Kahului harbor at night. This prohibition would extend, by inference, to manœuvering in the harbor at night. Further, contrary to the company's regulations, the steamer remained in the harbor that day and night without a bow line out to the bow moorings, having earlier in the day removed, as already noted, her bow line for use in towing. Upon the evidence, however, I cannot find that she in fact incurred any risk by reason solely of the absence of that line.

There was no risk to life at any time during the performance of the salvage service.

The Likelike is of the value of about $60,000, carrying $35,000 of insurance. Her average monthly receipts for freight and passengers are about $6,500, her owners holding contracts to carry to Honolulu all the sugar manufactured by certain plantations along her route.

Now that the Lurline is safe, there can be no certainty as to what would or would not have happened to her had not the Likelike come to her assistance; and yet after hearing all the evidence, I believe, as did Captain Brown at the time, that she was, while on the reef and unaided by the Likelike, in danger of becoming a total loss, in other words, that, without the aid

of the Likelike, she would have proved a total loss. The extent of the injury suffered by the heavy timbers of her keel until 9 o'clock of the Saturday morning leads me to the conclusion that the four-inch planking of her bottom could not have long withstood the action of the waves; and it would not have necessitated a very large hole to make her a wreck. Closely connected with this subject is the question of the availability of other means of assistance. Three such means have been suggested on behalf of the respondents, to wit: (1) the hauling of the vessel into deep water with hawsers and wire cables attached to her stern and passed through the bow moorings, power being furnished by steam plows stationed on the beach; (2) same as the first, except that the power was to be supplied by fifty or seventy-five men in line on the beach, and with the addition that the ballast was to be shifted to a certain side of the Lurline so as to cause her to draw less water; and (3) the sending to Honolulu per Likelike Sunday morning of a message for a tug, the latter to reach Kahului some time on Sunday evening and then tow the Lurline off. Some one of these methods may possibly have succeeded, but it should be borne in mind that with each of them considerable delay would have been necessary before an attempt could have been made to pull; and that delay would in all probability,—with certainty, I think,—have resulted in the knocking of a hole in the bottom of the ship. After that, towing into deep water would have been worse than useless.

What was the value of the Lurline, for the purposes of this case? The proctors for libellant admit that the value to be considered by the court may be, not of what was lost, but of what was saved. The cost of the repairs necessary to put the vessel in as good condition as she was in before she struck, was $3,400. On the question of what she is worth after being repaired, considerable expert testimony was introduced, but, as sometime happens in such cases, the experts failed to agree. One placed her value at $750, for old junk, adding that she could not, in his

opinion, be sold for any other purpose; another at $8,000, if placed on the market in San Francisco; a third, at $10,000 under similar circumstances; and a fourth, at $15,000, if purchased by one having a special use for her. The ship was built about ten years ago at a cost of about $20,000. Two years ago her present owner purchased her for $14,000. She is now insured for the sum of $15,000.

The value to be considered is, I think, the market value. But what is the "market value?" "It is the price which an article will bring when offered for sale in the market. It is the highest price which those having the *ability* and the *occasion* to buy are willing to pay." *R. R. Co. v. Woodruff*, 5 S. W. (Ark.) 794. What parties are willing to pay is better shown by what they actually pay than by what they say that they are willing to pay. In the case just cited, the court went on to say that every use to which the property was adapted and could be put by intending purchasers, should be taken into consideration in assessing the value.

In a land condemnation proceeding, reported in *R. R. v. Worcester*, 155 Mass. 39, the court said: "It would be entirely proper for the jury to say, in deciding the case, what were the purposes to which it (the land) was naturally adapted, or, if there was but one, what was that purpose for which it was naturally adapted. What were the uses or use to which it might properly be applied? It is for the jury to say, in view of such use or uses, what would be the fair value of the property."

In holding that a test of value adopted by the trial court was erroneous, the appellate court, in *Goodwin v. Canal Co. et al.*, 18 O. St. 181, said: "The true value of anything is what it is worth when applied to its natural and legitimate uses—its best and most valuable uses. The estimate should have been of its value generally, for any and all uses, and not for any particular, and especially not for any inferior or inappropriate use."

"When we speak of the market value of property as being what purchasers generally would pay for it, we do not mean what

men would pay who had no particular object in view in purchasing, and no definite plan as to the use to which to put it. The owner has a right to its value for the use for which it would bring the most in the market." Mills on Eminent Domain, Sec. 168, citing *King v. M. R'y.* 32 Minn. 224.

"Some of the cases hold that its value for a particular use may be proved, but the proper inquiry is, what is its market value in view of any use to which it may be applied and of all the uses to which it may be adapted?" Lewis on Eminent Domain, Sec. 479.

And so in the case at bar, while the particular use to which the vessel may be put is not the test of value, still the fact that the vessel is adapted to that particular use, is not to be disregarded. On the contrary I think that the salvors are entitled to have it taken into consideration. I adopt the rule as stated in the authorities above cited. Applying it to the evidence, I find that the value of the Lurline when repaired is $14,000. I make it this amount, and not $15,000, nor $10,000, nor $8,000, because to my mind what the vessel actually sold for two years ago, under conditions precisely like those which exist today, according to the undisputed testimony, is a far safer test of her present market value, than are the opinions of experts, however well qualified they may be to testify. The Supreme Court in *Wide-mann v. Thomas*, 10 Haw. 366, approved, on exceptions, a valuation of property based upon the result of an actual sale in preference to the opinions of experts.

The amount of the insurance on the vessel is not, in my opinion, a guide for the market value. It does not necessarily follow that the assured has been guilty of fraud, merely because, after a loss, it appears that the vessel was insured for more than her first cost to the present owners. "It often happens that expenses or profits are accruing, or expected to accrue, on the property, which the assured wish to cover, and for this purpose makes the valuation. Though the value at the commencement of the risk constitutes the amount of interest in an open policy, yet it is not

necessary to suppose that the parties have this value in view in agreeing upon a valuation. A valuation of goods which would be very high at the beginning of the risk, may be very low in a subsequent period of it, when great additional expenses have been incurred in the transportation of them, or their proceeds have become more valuable by trade.    *    *    *    It is for the interest of the assured so to value, that, in case of loss, he may be as nearly as possible indemnified. According to the voyage, state of markets, and other circumstances a valuation over cost and charges may only give indemnity; but this is a subject of estimate in the particular voyage." 2 Phillips on Ins., Secs. 1183, 1184.

While the amount for which a vessel may have been insured may be considered as a circumstance in arriving at its value after marine disaster, it is not direct evidence to that effect, nor can it be considered as conclusive as against more positive evidence of value, *e. g.*, as in this case, the result of an actual sale. See *Compagnie Commercial v. S. S. Co.*, 60 Fed. 923.

Upon all the evidence the vessel is unsaleable in Honolulu. The above valuation is based upon the market value in San Francisco, California. It is true that it has been held that where a salvage service is concluded at one port and the property saved is taken to another and sold, the value at the former port is to be taken. See Parsons, Shipping and Admiralty 302, n. 2. But it seems to me that it would be manifestly unfair and unjust to say that because the vessel cannot be sold here, the salvors shall have nothing for their efforts, although the vessel has a market value in the neighboring port of San Francisco; nor does the proctor for the owners ask the court to adopt any such rule. The solution of the difficulty would seem to be to hold that the market value in San Francisco, less all proper charges for the voyage from Honolulu to San Francisco, should be taken as the value in Honolulu. This was the course followed by the court, upon a similar state of facts, in the case of the George Dean, reported in Swabey, Adm., 290, and cited in 2 Parsons

302, n. 2.   But there is no evidence before the court tending to show what such charges would amount to in the case of the Lurline; in short, the owners practically consent that the item be not considered by the court; and for these reasons, it is not taken into consideration.

The undisputed evidence is that the Lurline, after being repaired, is in a condition fully as good as, but not better than, that in which she was before striking the reef.   Deducting $3,400, the cost of repairs, from $14,000, the value of the property lost, we have $10,600, which I find to be the value of the property saved.

It is admitted by proctor for respondents that the Likelike performed a salvage service.   The only question now remaining is, how much shall be awarded as compensation for that service?

This is not an action upon the contract for $5,000, but libel against the ship for the value of the service rendered.   It is clear, upon the authorities, that the sum agreed upon by the parties will be decreed by the court, unless the contract is unconscionable or was made under compulsion.   See 47 Fed. Rep. 906.   But if it appears from the evidence that the agreement was made under circumstances that amount to duress, or that the contract rate is clearly exorbitant or excessive, courts will not hesitate to disregard the contract.   Upon the facts as hereinabove found by me in regard to the circumstances under which the agreement for $5,000 compensation was entered into, I hold that the contract was made under compulsion, and that it is not binding, either on the parties or on the court.

The elements which are to be considered in a claim for salvage are, as decided by the Supreme Court, *In re 1206 Bags of Sugar*, (Liholiho), 9 Haw. 329:

(1)   The degree of danger from which the lives or property are rescued.

(2)   The value of the property saved.

(3)   The risk incurred by the salvors.

(4)   The value of the property employed by the salvors in the wrecking enterprise, and the danger to which it was exposed.

(5)   The skill shown in rendering the service.

(6)   The time and labor occupied.

The amount awarded, while it ought not to be exorbitant, should be liberal; it should be such "as to make every one concerned eager to perform the service with promptness and energy, * * * It would be contrary to the spirit of maritime law to reduce the salvage compensation below this standard of liberal inducement, and it would equally frustrate its purpose if the allowance should be so large and so out of proportion to the services actually rendered as to cause vessels, in situations in which it was expedient that they should quickly accept assistance of the character rendered in this case, to hesitate or decline to receive it because of its ruinous cost." *Ehrman v. S. S. Swiftsure*, 4 Fed. 467, 8.

No fixed rule has been, or can be, laid down, by which to measure the award. Each case must be decided in view of all the circumstances under which the salvage service is performed. And yet an examination of the reported cases on the subject is of value.

In the "Liholiho" case, the court cites with approval the statement contained in the Encyclopedia of Law that, "One-half will be given only where both considerable energy and great exertion have been displayed or a considerable danger incurred by the salvors. If the service rendered to derelicts be of extraordinary merit, even as much as two-thirds of their value may be awarded to the salvors, but it is with great reluctance that more than a moiety is rewarded."

A greater proportion is given where the value of the property saved is small, and a smaller proportion where the value is large. More is awarded where the salving ship is a steamer, and less where the service is performed by a sailing vessel; more where the ship in distress is on the open sea, and less where the mishap occurs near land; more in the case of a derelict, and less

in the case of a ship not abandoned; more in cases where no other means of assistance are at hand than in those where such other assistance can be had; more where there is risk to the lives either of the saved or of the salvors than where there is no such risk.    These are some of the rules which have been followed in adjudicated cases, and the soundness of which is not disputed.    The difficulty is merely in their application.

The proctors for the libellant, in support of their claim that $5,000 would be a fair and reasonable compensation, place ·great reliance upon the fact that at the time of undertaking the salvage service it was uncertain whether the vessel could be successfully towed into deep water, and contend that in this respect the case at bar differs from all the reported cases, and that therefore but little aid is to be derived from a study of said cases.    The element referred to exists, as I have found in this case, and it will be given due weight in making the award;  but an examination of the adjudicated cases shows that the proctors' statement is incorrect, and that as a matter of fact in some of them the element did exist and was considered by the court.    The following bear on this point:

*In re Attacapas*, 3 Ware 68, 69, the court said:    "That the attempt to save the vessel appeared at the time to be an enterprise of very considerable danger and hardship, I think, may be safely inferred from this, that out of about twenty persons present, all accustomed to the sea, only four could be induced, by the prospect of a salvage reward, to engage in the undertaking."    The Attacapas, with her freight, was worth $3,500. $1,200 salvage was allowed.

*In re The Brig. John Gilpin*, Olcott 88, in which finding of fact was made, that, "it was then midwinter, at the height of a northeast storm of wind and snow, in the night time; the brig lay at a point most exposed to danger from the winds and waves coming upon her from that direction; there was every probability she must be immediately broken up, causing the loss of everything on board," it was held that "not only the actual toil

and expenses are to be considered in a case of salvage, but also the imminent contingency that the services might prove un-availing by the breaking up of the vessel, before any amount of property could be saved." The property saved produced $11,-294.07. One-fifth was allowed as salvage.

*In re The Camanche*, 8 Wall. 448–480, the ship, with a cargo consisting of the materials and armament for the monitor "Ca-manche" and valued at $400,000, sunk at her moorings in San Francisco harbor, resting on the bottom with a list to starboard of 45°, her bow being in forty-eight to fifty feet of water and her stern in about nineteen feet. The salvage service lasted a little less than three months and cost the salvors nearly $70,-000. The cargo was insured for $340,000. At the completion of the work, which was done under contract for $110,000 compen-sation, all the insurance companies (except one which had a risk for $15,000 and had failed) paid as per agreement. A libel was then filed for salvage on the $60,000 uninsured and the $15,000 insured. "The risk of life and limb during this part of the labor was testified to be great and constant."   *   *   *.   There was great uncertainty of ultimate success. "The whole of the prop-erty on board when the agent of the libellants took possession of the wreck was rescued from imminent peril.   *   *   *   Diffi-culties almost unexampled attended the undertaking." Of the $75,000, $24,062 and interest from the beginning of the suit was awarded.

See also, the Emulous, 1 Sumn. 207, where an allowance of one-fifth was, on appeal, reduced to one-seventh; and the E. M. Munn, 61 Fed. 695.

The proctor for the respondent contends that the salvage ser-vice in the case at bar ended when the Lurline reached deep water in Kahului harbor, on the theory that she would have been able, unaided, to reach Honolulu; and that assistance rendered from that time until Honolulu was reached constituted merely a towage service. Granting, but not deciding that this contention is correct, I see no necessity for thus separating the items. The

7

salvage service, whether it ended at Honolulu or in Kahului harbor, was performed, and the result to be arrived at must in either case be the same.

The award made now is in view of the services rendered both by the "Likelike" and by her officers and crew and is intended as full compensation for both the owners and said officers and crew. The pleadings are, in my opinion, sufficient to authorize and require such an award. No apportionment is made, because none is asked, the parties apparently seeing fit to leave the matter for amicable adjustment without the aid of the court.

The contract for $5,000 is, I think, inequitable and oppressive to the owners of the ship. In view of all the facts and circumstances of the present case, and bearing in mind the rules and principles that should govern in a case of this nature, I award to the libellants as salvage the sum of $2,650, being one-fourth of $10,600, the value of the property saved.

Robert English, pilot as aforesaid, in behalf of himself and of his crew, filed, during the progress of the trial, a claim in the sum of $280 as compensation for the assistance given the ship while in distress  The services rendered were of a low grade of salvage services. I award the sum of $165, being $75 for Robert English, and $90 for the six men in equal shares.

All costs of these proceedings to be borne by the "Lurline."

## By the Court (Justice Whiting.)

We are of opinion that the decision appealed from should be sustained. Substantial justice has been done and the award appears to have been arrived at after a full and careful consideration of the evidence and of the law relating to salvage. No fixed rule can be laid down as to what percentage of value shall be awarded in such cases, but in each case the amount of salvage is to be awarded in accordance with the circumstances of the case. The appellant seeks to have the amount of salvage awarded increased by this court, but as such awards are always greatly

within the discretion of the admiralty judge in the first instance, the appellate court must be satisfied that there is manifest and material error shown to exist before it will interfere with or set aside such judgment especially in salvage cases where so much must be left to the sound discretion of the trial judge.

In the *Inter-Island S. N. Co. v. 1,206 Bags of Sugar*, 9 Haw. 329, the court say, "We do not question the principle laid down by Chief Justice Marshall in 'The Sibyl' (4 Wharton 98) that 'in case of civil salvage, where the amount of salvage is discretionary, appeals should not be encouraged upon the ground of minute distinctions of merit; nor will the court reverse the decision of an inferior court unless it manifestly appears that some important error has been committed."

The appellant appeals on the ground that the amount awarded was too small, and that it at least should have been one-third of the value salved, and claims that the trial judge did not give due weight to the evidence as to the danger that the salving steamer Likelike was placed in and incurred in the getting the Lurline off the reef and also in connection therewith the uncertainty of saving the Lurline and the large value of the Likelike at risk.

We have examined the evidence and decision, and are of opinion that the trial judge has fully considered these matters and that the evidence fully justifies his findings and judgment.

*Kinney & Ballou,* for libellants.

*A. S. Hartwell,* for libellee.